Drayton Cochran v. Commissioner. Estate of Elizabeth Cochran Bowen, Deceased, Mary Bowen Hjorth, William F.C. Ewing and Harry M. Zuckert, Executors, v. Commissioner.
Cochran v. Commissioner
Docket Nos. 8600, 9525.
United States Tax Court
1948 Tax Ct. Memo LEXIS 175; 7 T.C.M. (CCH) 325; T.C.M. (RIA) 48094; June 1, 1948
James T. Tynion, Esq., 39 Broadway, New York 6, N.Y., William S. Hirschberg, Esq., Smith Bldg., Greenwich, Conn., and Sidney L. Zuckert, Esq., for the petitioners. Conway Kitchen, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: These proceedings have been consolidated for trial and report. The respondent determined a deficiency in gift tax for the year 1941 *176 in Docket No. 8600, Drayton Cochran, in the amount of $58,215.37. The respondent determined a deficiency in estate tax in Docket No. 9525, Estate of Bowen, in the amount of $205,072.93. He has made claim for increase in the amount of the deficiency under section 871 (e) of the Internal Revenue Code to $205,780.88. The increase in the deficiency results from increase in the value of the net taxable estate by the sum of $1,335.74, on account of error in the amount of a deduction which was allowed by the respondent in determining the net value of the estate. Petitioners agree that the net taxable estate should be increased by the above amount, but deny that there is deficiency in estate tax in the amount which has been determined. One issue is common to both proceedings, namely, the fair market value on December 19, 1941, and November 3, 1942, of the common stock and scrip of Alexander Smith & Sons Carpet Company. The question of fair market value is the main question to be decided. Drayton Cochran made gifts of common stock and scrip certificates of Alexander Smith & Sons Carpet Company to four trusts on December 19, 1941. The aggregate amount of stock *177 which was the subject of the gifts was 66 shares. Two gifts consisted of 17 shares, each; and two gifts consisted of 16 shares, each. Elizabeth Cochran Bowen, the decedent, died on November 3, 1941. Petitioners have elected to have the estate valued on the optional valuation date, November 3, 1942. Part of the property of the estate consists of 73 shares of common stock and scrip certificates of Alexander Smith & Sons Carpet Company. The gift tax return for 1941 was filed with the collector for the third district of New York. The estate tax return was filed with the collector for the collection district of Connecticut, at Hartford. In Docket No. 9525, Estate of Bowen, petitioners do not contest one determination of the respondent; they have waived certain issues. The amounts of certain items for which deductions are allowable are to be agreed upon by the parties under Rule 50. Also, further deductions, if any, for executors' commissions, attorneys' fees, and administration expenses are to be agreed upon by the parties under a Rule 50 stipulation. Effect will be given to the various concessions and agreements of the parties in the recomputations to be filed by them under Rule *178 50. Findings of Fact 1. The petitioner, Drayton Cochran, by four separate indentures of trust, each dated December 19, 1941, transferred to Morgan J. O'Brien, Jr., and Gifford A. Cochran, as trustees, 66 shares of capital stock of Alexander Smith & Sons Carpet Company, with accompanying scrip certificates, also 66 in number. The four trusts created were for the benefit of the children and wife of the petitioner. 2. Petitioner filed a Federal gift tax return for the year 1941 with the collector of internal revenue for the third district of New York, and therein reported the gifts of said 66 shares and said accompanying scrip certificates at a value of $2,500 per share (including the value of said accompanying scrip) on the date of the gifts, namely, December 19, 1941, making an aggregate value of gifted property of $165,000. 3. The respondent determined the value of said stock and scrip, as of December 19, 1941, to be $514,907.58, or $7,801.63 a share. 4. Elizabeth Cochran Bowen died testate, a resident of the town of Greenwich, county of Fairfield, state of Connecticut, on November 3, 1941. On November 17, 1941, the Probate Court for the District of Greenwich, Connecticut, *179 granted letters testamentary to Mary Bowen Hjorth, William F. C. Ewing, and Harry M. Zuckert, executors. 5. The Federal estate tax return for the estate of said decedent was duly filed by the executors with the collector of internal revenue at Hartford, Connecticut. In this return the executors elected to have the gross estate valued as of a date or dates subsequent to the decedent's death as authorized by section 811 (j) of the Internal Revenue Code. 6. Among the assets included in the gross estate of the decedent were 73 shares of capital stock of Alexander Smith & Sons Carpet Company, and accompanying scrip certificates, also 73 in number. In the Federal estate tax return, the stock and accompanying scrip were reported at a value of $182,500, or $2,500 per share (including the value of said accompanying scrip) as of the optional valuation date, November 3, 1942. 7. The respondent determined the value of said stock and scrip, as of November 3, 1942, to be $569,518.99, or $7,801.63 a share. 8. The Alexander Smith & Sons Carpet Company (hereinafter designated as SmithCompany) is one of the principal manufacturers of wool pile rugs and carpets, and is *180 a successor to the original business which was established by Alexander Smith in 1845 in West Farms, New York, and which, in 1864, was removed to Yonkers, New York, where it has since been located. The present company was incorporated in 1873, taking over the assets of a co-partnership in which Alexander Smith had the principal interest. 9. At the time of the organization of the SmithCompany, 3,000 shares of capital stock, par $100value per share, were issued, and very shortly thereafter scrip certificates were issued so that each certificate of stock was accompanied by a certificate of scrip having a face value equal to the par value of the stock. The scrip bore no interest, and was transferable only with an equivalent amount of stock; the scrip had never participated in any distribution of earnings, and was considered a part of the share which it accompanied. Wherever reference is made hereafter to a share of such stock, the scrip which accompanied such share, and had no separate value, is deemed to be included. The capital structure as thus established had, on December 19, 1941, and on November 3, 1942, remained unchanged. 10. The Company's stock has been closely held from *181 the time of incorporation to the basic dates herein, and has never been listed on any stock exchange. On December 19, 1941, and on November 3, 1942, the descendants and kin of the family of Alexander Smith owned almost 77 per cent of the stock. Another 14 1/2 per cent was owned by the Sloane family. Decedent, Elizabeth Cochran Bowen, was a granddaughter of the founder of the business, and Drayton Cochran is his great grandson. 11. The Company manufactures axminster, velvet and wilton carpets and rugs in a wide variation of widths and sizes, as well as of designs and patterns. 12. From November 1, 1938, to and including December 31, 1942, part of the earnings of the SmithCompany resulted from a sales agency contract with another carpet manufacturer, C. H. Masland & Sons. The original contract, which was for a three-year term, was amended twice before the expiration of the term, and was then renewed with certain revisions for another three-year term ending November 1, 1944. The commissions on the Masland contract amounted to over 9 per cent of SmithCompany's net income before taxes in 1939 and in 1940, over seven per cent thereof in 1941, and over 17 per cent thereof in 1942. *182 13. Since November 1938, SmithCompany has handled its own sales. About twothirds of its products have been sold through distributors who in turn sold to department stores and other outlets. The remaining third has been sold through mail order houses, or, directly, through the Company's own warehouses. Approximately 20 to 25 per cent of the Company's total sales were made through the mail order houses, and most of this was accounted for by two customers. 14. From 1935 to 1942 dividends, per share, were as follows: 1935, $100; 1936, $200; 1937, $250; 1938, 0; 1939, $400; 1940, $400; 1941, $400 and 1942, $250. For the seven-year period, 1935-1941, inclusive, Smith's dividends averaged $250 per share. For the seven-year period, 1936-1942, inclusive, Smith's dividends averaged $271 per share. 15. The gross sales of SmithCompany for the years 1936 to 1942, inclusive, were as follows: 1936
$17,480,995
1937
19,164,899
1938
14,436,051
1939
21,810,491
1940
23,628,600
1941
33,955,565
1942
32,550,252
The SmithCompany's earnings (or losses) for the fifteen years 1928-1942, inclusive, and its earnings per share during such years were as follows: Earnings
Year
Earnings
per share
1928
$ 456,820 $152
1929
704,265 (loss)
235 (loss)
1930
2,297,752 (loss)
766 (loss)
1931
565,275 (loss)
168 (loss)
1932
11,716 (loss)
4 (loss)
1933
648,962
216
1934
118,188
39
1935
856,252
285
1936
898,200
299
1937
562,401
187
1938
125,658
42
1939
2,887,019
962
1940
2,651,703
884
1941
2,857,938
953
1942
1,589,517
530
*183 16. Carpets and rugs are a luxury or semiluxury product. The carpet and rug industry is highly cyclical and among the first to suffer in a depression, and to lag behind in the subsequent period of recovery. The turnover of capital and the margin of profit are normally lower than in manufacturing industries generally. The sales of SmithCompany follow the general pattern of the industry as a whole. 17. There has been a declining trend in the amount of carpet used by the average family; the output of cheaper linoleums and other floor coverings have increased tremendously, while their cost has steadily declined. From 1909 to 1939 the physical volume of production of carpets and rugs declined from some 81,200,000 to some 63,500,000 square yards. 18. Raw materials are the chief element in the Company's cost of production. The price of these materials is subject to violent fluctuations, against which the Company cannot protect itself by hedging. An additional source of uncertainty is due to changes and prospective changes in tariff regulations and schedules to which the industry is subject. 19. The production cycle is a lengthy one. An extremely heavy investment in both raw and finished *184 materials is necessary due in part to that fact, and because of the large variety of sizes, patterns, colors and qualities which are required to be kept on hand, and because the principal raw materials must be imported. This requires the Company to bear a correspondingly heavy inventory risk. 20. Availability and cost of labor is an important factor affecting SmithCompany's earnings. In 1941 labor represented 28 per cent of the total production cost. Approximately 64 per cent of the labor is skilled, and 7 per cent semi-skilled. The average hourly wage rose from 63.1 cents in 1937 to 82.6 cents in 1942. The Company inaugurated a Retirement Income Plan in 1941, at a cost, during the first year of over $104,000. 21. There is intense competition in the industry. The sales price is a more than usually important competitive factor due in part to the inability of the general purchasing public to observe relative advantages in quality and construction, or, except as identified by labels, to distinguish the products of one manufacturer from those of another. Over 50 per cent of the entire output is accounted for by the SmithCompany, Bigelow-Sanford Carpet Co., Inc., of New York, and *185 Mohawk Carpet Mills, Inc., of Amsterdam, New York and Thompsonville, Connecticut. There is no connection between these companies. Smith has no advantage over the others through ownership of patents or processes, and is somewhat at a disadvantage with respect to labor and real estate taxes. 22. The SmithCompany spun and dyed its woolen yarns, but it had no cotton yarn spinning facilities. 23. The industry was a "non-essential" one and was so classified by the War Production Board in February 1942. 24. Supplies of foreign raw materials were immediately restricted following the outbreak of the war in Europe in 1939. Shipping became scarce. Within less than a month after the United States entered the war, the use of carpet wools was curtailed, and later the use of jute, these being the two most important raw materials used by the Company. 25. As early as September 1941, the outlook for the Company was recognized as highly uncertain and gloomy. Labor was being siphoned out of the Company's mill to war industries, and there was doubt whether the Company would be permitted to continue in civilian production. Curtailment or retrenchment and the possibility of having to withdraw immediately *186 from business on a liquidating basis were seen by the Company as threatening. 26. On December 16, 1941, the O.P.A. had limited prices on carpets and rugs to the highest charged between January 1 and October 13, 1941, increasing this by 5 per cent on January 2, 1942, and with no further increase during 1942. 27. The SmithCompany was not in a favorable position as regards war work. Its possibilities were limited to heavy duck and blankets, and the Company started on its own initiative, in 1941, to change a number of carpet looms over to the set-up by which they could be used to make duck, even though war orders had not yet been obtained and there was the risk of not being compensated for the costs of converting looms in preparation for war orders, if war orders at satisfactory prices were not obtained. By December, 1941, twenty-six looms had been converted to the manufacture of duck; on December 17, 1941, it purchased ninety-nine draper looms for such production, and thereafter it converted a large number of carpet looms to such manufacture and also purchased blanket looms. In January, 1942, 342 carpet looms were converted to manufacturing cotton duck. The cost of such changing *187 over of its equipment in 1942 to handle war work was just short of $623,000. The Company was, at first, unable to get orders for duck, partly because of O.P.A. price ceilings. Its costs were high because it could not successfully compete with companies having cotton yarn spinning facilities; it was obliged to pay the southern manufacturers more for the yarn than the existing ceiling price on finished duck really allowed; its labor costs were over 40 per cent higher than those of the southern manufacturers; and its looms were heavy and slow and not capable of the multiple operations practiced in the southern mills. O.P.A. permitted the prices of the component cotton yarns to rise but held down the selling price of duck. It was not until February, 1942, that the Army consented to pay the Company more for duck than the O.P.A. ceiling price. The other conditions remained unimproved. All of these factors kept the Company from getting war orders in 1941. 28. On December 19, 1941, the Company, despite diligent efforts, had no war contracts, and was uncertain whether it could secure them and maintain employment for its labor. Its first orders were under subcontract in February, 1942, and *188 under a direct contract from the Government in March, 1942. 29. The trend of corporate taxes was upward on both the basic dates herein. Substantial tax increases were imposed by the Revenue Act passed in September 1941, and even heavier increases were imposed by the new tax bill passed in October 1942. 30. On both the basic dates herein the trend in residential construction, on which the demand for carpets largely depended, was downward, with increasingly stringent Government prohibitions against it. 31. During 1942 the SmithCompany's costs of production of carpets and rugs rose steadily. Wool rose 4 cents and jute 5.5 cents per pound, and the other material prices rose similarly. Labor costs rose approximately 15 per cent, with production efficiency decreasing. There was also a decrease in sales, so that there was a shrinkage of some two and a half million dollars in the operating profit on carpet and rugs during that year. 32. The business for 1942 in the ordinary products of the Company was, inventories, and this had been true to some extent in 1941. The inventory of finished rugs and carpets decreased from $5,408,682.58 at the end of 1940 to $4,981,464 at the end of 1941 *189 and to $1,025,646 at the end of 1942 and there was also a substantial decline in the inventory of carpet raw materials and of work in process during 1942. 33. During 1942 the Company suffered large and substantial losses from its sales to the Government. 34. Due to the shrinkage in carpet profits and the losses sustained in Government production there was a decline in the Company's income before taxes in 1942 as against 1941 of 51.3 per cent after certain adjustments. 35. As of November 3, 1942, there was every indication that the war would be a long one, with ever increasing Government control, with no certainty whether raw materials or shipping facilities would be available at the termination of the war or not until some still more distant time; the Company had lost numbers of skilled workers to the armed forces and war industries, and a very sharp drop had occurred in the number of looms engaged in carpet production. 36. The trading in stocks had showed a decided drop in 1941, and even greater during the first ten months of 1942. From December 1941, to November 1942, the investment atmosphere was characterized by caution and inactivity. 37. On April 11, 1933, thirty-nine *190 shares of stock of the SmithCompany were sold through brokers by Walter W. Law, Jr. to Maitland Griggs (ten shares), Mr. Edie (ten shares), William F. C. Ewing (twelve shares), and Harry M. Zuckert (seven shares), at a price of $1,282.50 a share. 38. On December 15, 1937, ten shares of stock were sold by the Greenwich Trust Company, as successor trustee for Robert Irving Von Schuckman, to Harry M. Zuckert, acting for himself (with respect to three shares), for Frederick B. Klein (with respect to five shares) and for Robert P. Ridges (with respect to two shares), at a price of $2,500 a share. 39. On September 28, 1938, three shares of such capital stock were sold at public auction by Martha Law Kerr to Harry M. Zuckert, acting as attorney for Frederick B. Klein, at a price of $2,000 a share. 40. In September 1938, 120 shares of such stock were sold at public auction by the executors of the estate of Henry T. Sloane and bought by the trustees of that estate at a price of $2,015 a share. 41. On November 20, 1940, five shares of such stock were sold at public auction at which several persons bid on the stock, by Alston Beekman, executor of the estate of Helen C. Smith, to Harry *191 M. Zuckert, acting as attorney for five individuals (Frederick B. Klein, M. L. Griggs, William D. Gardner, W. F. Cochran, Jr., and Drayton Cochran, the petitioner in Docket No. 8600), each of whom purchased a single share, at a price of $2,700 a share. 42. On July 31, 1941, ten shares of such stock were sold by Theodore Gilman Law, executor of the estate of Henry H. Law, to Gifford C. Ewing, at a price of $2,500 a share. Both seller and buyer were represented by attorneys. 43. On November 27, 1941, ten shares of such stock were sold by the Superintendent of Banks of the State of New York, as liquidator of the Westchester Trust Company, to William D. Gardnet, at $3,000 a share. Mr. Gardner retained two of the shares, and sold or "distributed" the remaining eight to Robert P. Ridges, Frederick B. Klein, M. L. Griggs, and W. C. Hammel, at the same price. Beginning with the year 1936, condensed balance sheets and profit and loss statements of the SmithCompany had been sent annually to the liquidator, in response to his inquiries, the latest statements, consisting of the Company's balance sheets as of the end of 1940 and operating figures for that year, had been furnished him in *192 May 1941. 44. The Bigelow-Sanford Carpet Company and Mohawk Carpet Mills are engaged in the same line of business as SmithCompany and the stock of both of them is listed on an exchange. The similarity between these three leading companies is unusually close. All have been long-established. During 1929-1942 the sale of the Smith Company varied from 24 per cent to 34 per cent of the total sales of the three companies; the percentages in 1941 and 1942 being 33 per cent and 31 per cent, respectively. In 1941 and 1942, and for many years prior thereto, the products of all three companies represented a comparable, comprehensive and diversified line. All three companies spun their own wool yarn and operated their own dyeing facilities; and the manufacturing properties of all three were located in the northeastern section of the country. All had enjoyed substantial continuity of management. The balance sheets of the three companies, as of December 31, 1941, and as of December 31, 1942, show great similarity in financial position and the overall composition of their net worth; in particular, as regards relationship of current assets to current liabilities, and as regards proportion *193 of net worth represented by inventory, as well as proportion represented by fixed assets. The capital structure of each of the three was quite similar; the capital of Smith and Mohawk was comprised solely of common stock, and Bigelow-Sanford had only a relatively unimportant issue of preferred. There is a close similarity in the percentage of selling and administrative expenses to sales, in the percentage of receivables to sales, and in the percentage of inventories to sales. The sales and earnings history of the three companies, over the period 1925-1942, presents remarkably similar fluctuations. All companies suffered severely from the depression as well as from depressed conditions in 1938, while all benefited from the expansion in public buying power in 1939, 1940, and 1941; and all sustained a substantial drop in earnings in 1942. All three companies were similarly affected by price fluctuations in raw materials and by the restrictions on the supply thereof caused by the war in Europe, and, after the entry of the United States, by the limitations imposed by the War Production Board; and all were similarly affected by the price ceiling on finished carpets. The uncertain outlook *194 resulting from adverse war conditions, as regards Bigelow-Sanford and Mohawk, is reflected in the annual reports issued by those companies on February 17, 1942, and February 10, 1942, respectively. 45. The stock of Smith Company, from 1873 through 1942, has never been listed on any stock exchange. It has always been closely held, and unlike its chief competitors, the number of shares outstanding has remained limited, and comparatively small in numbers of shares. Sales transactions in the SmithCompany stock have been infrequent. 46. Twelve thousand seven hundred shares of Bigelow-Sanford's common stock were traded in on the New York Stock Exchange during October, November and December, 1941, and 6,400 shares during September, October and November, 1942. On December 19, 1941, the price was 24 1/2. November 3, 1942, was a holiday. The price on November 2 was 25 1/2, on November 4, 26 bid and 28 asked, and on November 5, 25 1/2 to 25 3/4. The preferred stock, dealt in on the Boston Stock Exchange, showed no sales in the week of December 19, 1941, but in the previous week had been traded in at 106 and in the subsequent week at 105 3/4 to 106. The closest sales in 1942 were in the week *195 ending October 23 at 103, and in the week ending November 13 at 103 1/2 to 104. Fourteen thousand five hundred shares of Mohawk's stock were traded in on New York Stock Exchange in October, November and December, 1941, and 6,300 in September, October and November, 1942. On December 19, 1941, the prices were from 13 to 13 3/8. On November 2, 1942, the prices were 17 1/4 to 17 5/8, and on November 4, 17 1/2 bid, 18 asked. 47. The foregoing sales represent a market appraisal for Bigelow of $10,482,139 as of December 19, 1941, and of $10,899,746 as of November 3, 1942 (313,609 shares common and 26,403 shares preferred); for Mohawk, of $7,046,000 as of December 19, 1941, (542,000 shares) and of $9,292,500 as of November 3, 1942, (531,000 shares). 48. The book values per share of SmithCompany, (3,000 shares) Bigelow-Sanford common (313,609 shares common and 26,403 preferred) and Mohawk (542,000 shares in 1941 and 531,000 shares in 1942) from 1937 to 1942 were as follows: Smith
Bigelow
Mohawk
1937
$6,234.55
$65.85
$30.61
1938
6,276.44
60.84
27.64
1939
6,788.78
62.85
28.36
1940
7,324.34
65.96
30.10
1941
7,876.99
67.98
31.76
1942
8,123.50
69.50
33.18
*196 The average sale prices of Bigelow-Sanford stock were at the following percentages of its book value: 1937, 70 per cent; 1938, 38.6 per cent; 1939, 39 per cent; 1940, 37.1 per cent; 1941, 39 per cent, and 1942, 34.5 per cent. The average sale prices of Mohawk stock were at the following percentages of its book value: 1937, 88.2 per cent; 1938, 56 per cent; 1939, 54.7 per cent; 1940, 48.2 per cent; 1941, 47.2 per cent; and 1942, 45.2 per cent. 49. Net current assets (working capital) per share of the three companies at the end of 1941 and the end of 1942, respectively, were: Smith
Bigelow-Sanford
Mohawk
(after deducting pfd. stock.)
1941
$4,650 $41 $23
1942
4,886
45
25
The mean market price of both Bigelow-Sanford and Mohawk in 1941 was 65 per cent of net working capital per share. The mean market price in 1942 of Bigelow-Sanford was 53 per cent and of Mohawk 60 per cent of working capital. 50. The surplus of Alexander Smith & Sons Carpet Company as shown on the balance sheets of said Company for the calendar years 1936 to 1942, inclusive, was as follows: 1936
$18,291,270.68
1937
18,103,672.33
1938
18,229,330.93
1939
19,766,350.83
1940
21,373,041.31
1941
23,030,979.39
1942
23,770,497.36
*197 51. The officers of Smith Company from 1928 through 1942 were as follows: President William Hetherington, * 1928 to May 15, 1931 Thomas Ewing, * May, 1931, to March, 1933 Frederick B. Klein, * March, 1933, through 1942 First Vice-President Thomas Ewing, * 1928 to June, 1931 Frederick B. Klein, * June, 1931, to March, 1933 William F. C. Ewing, * March, 1933, through 1942 - (also, Treasurer 1936-1942) Vice-President Maitland L. Griggs, * March, 1933, through 1942 Vice-President (Sales) William D. Gardner, * 1939 through 1942 Treasurer Richard Edie, * 1928 to October 2, 1935 William F. C. Ewing, * October, 1935, to December 31, 1935 Secretary Arthur Land, 1928 to August, 1931 William F. C. Ewing, * August, 1931, to March, 1933 Herbert Golding, March, 1933, to September, 1937 Robert P. Ridges, October, 1937, through 1942 Assistant Secretary William F. Cochran, Jr. * 1936 through 1938 Drayton Cochran, * 1939 through 1940 Frank G. See, 1941 through 1942 52. The directors of Smith Company from 1928 through 1942 included at various times some of those named above after whose names asterisks appear. 53. The financial statements of *198 SmithCompany for the years 1936-1942, Exhibit 3, are incorporated herein as part of the findings of fact by this reference. The balance sheets and accompanying income statements, prepared by Lybrand, Ross Bros. & Montgomery for the years 1937-1942, both years inclusive, Exhibits 5, 6, 7, 8, 9, 10, E-B, are incorporated herein as part of the findings of fact by this reference. Condensed comparative balance sheets of SmithCompany for the years 1939 through 1942, and the condensed statements of income and surplus for the same years are as follows: TABLE A CONDENSED COMPARATIVE BALANCE SHEETS
December 31, 1939-1942
ASSETS:
1939
1940
1941
1942
Current assets: Deposits in banks and cash on hand
$ 1,170,588.32
$ 2,284,283.87
$ 3,385,584.67
$ 2,454,838.26
Government bonds
2,001,200.00
3,101,200.00
Notes, accounts and other receivables,
less reserves
3,540,724.68
3,173,554.71
3,756,582.68
2,644,625.87
Inventories
10,204,470.73
10,931,799.69
11,901,840.45
11,202,811.79
Total current assets
$14,915,783.73
$16,389,638.27
$21,045,207.80
$19,403,475.92
Government bonds on deposit as guaranty
or security
156,058.11
156,058.11
156,058.11
216,261.24
Investment in Sloane-Blabon Corporation
and predecessors
601,400.00
741,968.65
741,968.65
741,968.65
Other investments
343,279.72
318,320.81
320,525.13
380,952.77
Plant and equipment, less allowance for
depreciation
7,837,783.98
7,930,591.36
8,246,226.71
8,330,529.90
Trade-marks and patents
1.00
1.00
1.00
1.00
Prepaid expenses and deferred charges
413,117.24
389,180.26
456,158.74
388,843.43
Total assets
$24,267,423.78
$25,925,758.46
$30,966,146.14
$29,462,032.91
LIABILITIES: Current liabilities: Notes payable, banks, other notes and
acceptances payable
$ 112,304.15
$ 39,725.99
$ 38,665.09
Accounts payable
1,834,913.01
1,527,066.02
1,674,334.60
$ 1,791,814.33
Accrued liabilities
1,776,274.36
2,195,980.27
5,381,725.14
2,954,599.41
Total current liabilities
$ 3,723,491.52
$ 3,762,772.28
$ 7,094,724.83
4,746,413.74
Reserves
177,581.43
189,944.87
240,441.92
345,121.81
Capital stock
300,000.00
300,000.00
300,000.00
300,000.00
Scrip certificates
300,000.00
300,000.00
300,000.00
300,000.00
Surplus
19,766,350.83
21,373,041.31
23,030,979.39
23,770,497.36
Total liabilities
$24,267,423.78
$25,925,758.46
$30,966,146.14
$29,462,032 $91
*199 TABLE B - CONDENSED COMPARATIVE STATEMENTS OF INCOME AND SURPLUS FOR THE YEARS 1939-1942 (After certain adjustments) Gross sales, less discounts, etc
$21,810,491.66
$23,628,600.74
$33,955,565.08
$32,550,252.09
Cost of goods sold
14,960,391.27
16,405,177.78
22,724,733.73
26,780,470.81
Gross profit on sales
$ 6,850,100.39
$ 7,223,422.96
$11,230,831.35
$ 5,769,781.28
Sales agent commissions
344,133.20
365,100.56
503,192.69
597,718.99
$ 7,194,233.59
$ 7,588,523.52
$11,734,024.04
$ 6,367,500.27
Sales, admin., gen'l. expenses
3,385,740.85
3,709,878.19
4,841,080.72
3,104,633.59
Operating profit
$ 3,808,492.74
$ 3,878,645.33
$ 6,892,943.32
$ 3,262,866.68
Other income
43,897.78
52,372.68
84,460.58
143,401.16
$ 3,852,390.52
$ 3,931,018.01
$ 6,977,403.90
$ 3,406,267.84
Other deductions
111,504.94
99,879.72
26,465.82
21,749.87
Income before taxes
$ 3,740,885.58
$ 3,831,138.29
$ 6,950,938.08
$ 3,384,517.97
Reserves for taxes
853,865.68
1,179,435.04 [1]
4,093,000.00 [1]
1,795,000.00 [1]
Net income
$ 2,887,019.90
$ 2,651,703.25
$ 2,857,938.08
$ 1,589,517.97
Provision for post-war conversion
100,000.00
Net income
$ 2,887,019.90
$ 2,651,703.25
$ 2,857,938.08
$ 1,489,517.97
Dividends
$ 1,200,000.00
$ 1,200,000.00
$ 1,200,000.00
$ 750,000.00
Bal. Surplus Jan. 1 after adjustments [2]
$18,079,330.93 [2]
$19,921,338.06 [2]
$21,373,041.31
$23,030,979.39
Bal. Surplus December 31
19,766,350.83
21,373,041.31
$23,030,979.39
23,770,497.36
*200 54. At all times, including 1942, the capitalization of SmithCompany has amounted to $600,000, representing the par value of 3,000 shares of stock outstanding, $100 per share, and the par value of 3,000 accompanying scrip certificates, $100 per share. From 1928 to 1942, the Company had no bonded indebtedness. 55. The net current assets of the Company in 1941 and 1942 were as follows: 1941
$13,950,483
$4,650 per share
1942
14,657,062
4,885 per share
56. The book value of the stock in SmithCompany was $7,957.14 per share in 1941, and $8,288.54 per share in 1942. 57. The gross sales of SmithCompany in 1941 were the largest in the history of the Company. *201 58. The sales of stock in SmithCompany in 1933, 1937, 1938, 1940, and 1941, above set forth, were bona fide sales. 59. The estate has resources on hand sufficient to pay fees of executors and attorneys when they are determined. 60. The stock of SmithCompany lacked marketability. 61. The fair market value of SmithCompany stock was $2,930 per share on December 19, 1941, and $3,320 per share on November 3, 1942. Opinion The only question is the fair market value of the stock and acompanying scrip of Alexander Smith & Sons Carpet Company, for purposes of gift and estate taxes, on December 19, 1941, and November 3, 1942. The respondent, in making the determinations which give rise to the deficiencies, did not determine that the values differed on the respective dates. He determined that the value of the stock was $7,801.63 on each date. In the gift and estate tax returns, the value was reported to be $2,500 per share on each date. These proceedings were submitted upon a record consisting of general testimony, expert testimony and exhibits. Petitioners called two expert witnesses, Duncan M.Spencer and Robert J. Wilkes. The respondent called one expert witness, Dr. Paul M. *202 Atkins. Respondent now contends, on brief, that the fair market value of the stock was at least $5,000 per share on December 19, 1941, and $4,550 on November 3, 1942. Petitioners now contend, on brief, that the fair market value of the stock was $2,900 per share on December 19, 1941, and $3,000 on November 3, 1942. The regulations of the Commissioner relating to the gift tax, Regulations 108, section 86.19 (c), provide that, in the case actual sales or bona fide bid and asked prices are not available, consideration should be given to the Company's net worth, earning power, dividend paying capacity, and all other relevant factors having a bearing upon the value of the stock to be value. See also, Regulations 105, relating to the estate tax, section 81.10 (c), which makes the same provision. Every relevant factor having a bearing upon fair market value must be considered. Laird v. Commissioner, 85 Fed. (2d) 598, 601. Prices at which stock is traded in the open market on the pertinent date are regarded generally as the best evidence of fair market value on that date. *203 Estate of Leonard B. McKitterick, Dec'd, 42 B.T.A. 130, 136. Under the pertinent regulations, above cited, where the stock to be valued is unlisted, but is dealt in by brokers, and where there were no sales on the critical date, prices at which stock changed hands in transactions on a date nearest to the critical date, before and after, may be considered if the dates were within a reasonable period. The evidence shows that transactions in SmithCompany stock were infrequent and few in number, and there is no evidence of any sales in 1942. There was one transaction, involving ten shares, on November 27, 1941, within thirty days before the first valuation date, and another on July 31, 1941, involving ten shares. The sales prices were $3,000 and $2,500 per share. The transactions were bona fide. However, each one involved only ten shares of stock; and it was one of the infrequent transactions in the stock. Whatever market there was for the stock was limited because the SmithCompany is a family owned, family controlled, close corporation. See Brooks v. Willcuts, 78 Fed. (2d) 270. Also, the stock is not listed. The sales of stock on July 31, 1941, and on November 27, 1941, are *204 given consideration, but they are not determinative nor controlling of the question of fair market value. See Wood v. United States, 29 Fed. Supp. 853, 859. The question of fair market value must be decided in this case upon the general evidence adduced, including the opinions of the three expert witnesses, all of whom were qualified by training and experience to formulate estimates of value. The SmithCompany stock was owned by two families to the extent of about 91 1/2 per cent of the outstanding stock. The stock lacks marketability because it is unlisted, closely held, and the total amount of stock outstanding is small. It is not readily available for sale. The unit price per share is necessarily large because of the small amount of outstanding stock. The property to be valued is 73 shares, in the estate tax proceeding, and four gifts of small lots of stock. In the gift tax proceeding there were two gifts of seventeen shares, each; and two gifts of sixteen shares, each Each gift is to be valued. See Lawrence C. Phipps, 43 B.T.A. 1010; aff'd, 127 Fed. (2d) 214; and Thomas A. Standish, 8 T.C. 1204. Each lot of stock represents *205 a minority interest in SmithCompany. Both of the expert witnesses of the petitioners took into consideration in formulating their opinions of fair market value, SmithCompany's net worth, earning power, and dividend paying capacity. They considered other factors which were relevant and had a bearing upon fair market value, as follows: The position of SmithCompany in the carpet and rug industry; the characteristics and problems of the carpet and rug industry, such as wide fluctuations in the demand for the product, the importance of raw materials and of inventories; the economic and business situation in the country in December 1941, and during 1942; the problem of raw materials, which were imported, which arose in the war period; limitations imposed by the Government on the industry; limitations on the production of carpets and rugs during the war; the gradual liquidation of inventories; declining sales of carpets and rugs during the war; necessity for conversion to war production; the trend toward increased taxes; the condition of the securities market in December 1941, and during 1942; the lack of marketability of the stock; the minority interests which the stock to be valued *206 represented; prospects of future earnings; the adverse effects of the war upon the industry as a whole and upon SmithCompany; and the various elements which enter into valuation of common stocks, such as book value on the critical basic dates, earnings per share; yield; the past volume of sales, earnings and dividends of SmithCompany in normal years and poor years; net worth of the Company. The witnesses of petitioners made a thorough analysis and comparison of the three leading concerns which manufacture carpets and rugs in the United States, Bigelow-Sanford, Mohawk, and SmithCompany. In the seven years ending with 1941, the combined sales of these three leading companies represented an average of 48.7 per cent of the total shipments of the industry as compiled by the Institute of Carpet Manufacturers of America, Inc. The three companies are very closely comparable; in fact the similarities of each company to the other is rather unusual in industry. The stock in Bigelow-Sanford and Mohawk are listed on the stock exchange. As the three companies are closely comparable, it was a sound approach to the valuation question presented for the two experts of petitioners to consider in *207 their opinions of value the market prices at which the stocks of Bigelow-Sanford and Mohawk were selling at the critical dates, and to compare the values of the stocks in the three companies on the several bases which are usually considered by professional, commercial analysts. This test of fair market value of unlisted stocks by comparison with stocks in comparable corporations is a standard test, and now has been given approval by the Congress in the new provision in the Internal Revenue Code, subsection (k) of section 811, which was enacted in 1943. The value of stocks of similar corporations, engaged in the same business is one of the factors properly to be considered, along with all other factors. See Horlick v. Kuhl, 62 Fed. Supp. 168, 175; Blackard v. Jones, 62 Fed. Supp. 234; Oxford Paper Co. v. United States, 52 Fed. (2d) 1008; Rheinstrom v. Willcuts, 26 Fed. Supp. 306. In making the comparisons, consideration was given to the seven-year period, 1935 through 1941. The year 1941 was taken into account. Consideration was given to other periods; the fifteen-year period from 1928 through 1942; and the five-year period, *208 1938 through 1942. These periods provide satisfactory test periods of normal operations, and comparisons. Abnormalities of the year 1938 were noted. Comparative sales, earnings, dividends, and net worth of the three companies were studied, and per share values of each of the three companies were computed on the basis of sales, dividends, and net worth of each company. The value of the stock of the SmithCompany was computed on the basis of use of factors arrived at from the market values of the stock of the other two companies. Upon careful consideration of the analyses made by the petitioners' experts, we consider them to be sound. Both of petitioners' expert witnesses first computed the value of SmithCompany stock, on the basis of many relevant factors, and comparisons with market values of stocks of the other two companies without consideration of the factor of lack of marketability. Such value assumed the same marketability as the stocks of the other two companies enjoyed. Both witnesses believed that the disadvantage inherent in an unlisted and closely held stock would be considered by the assumed willing buyer and willing seller in arriving at a price in a sale transaction, *209 and that a discount below the market prices of comparable stocks must be applied in the final valuation of SmithCompany stock. One expert considered that a 20 per cent discount should be applied the other applied a 15 per cent discount. Respondent's expert gave attention to several factors of general relevance to valuation on the critical dates, but it appears that he gave them very little weight. He rejected any comparison whatsoever with the market values of stocks in Bigelow-Sanford and Mohawk for reasons which we consider to be superficial, namely, rather small differences in the amounts of dividends per share paid, respectively, and in increases in net worth. The close similarities among the three companies, which make them the triplets of the carpet and rug industry, so to speak, he recognized, nevertheless. Valuation is a matter of making estimates, and there is no one method which must be used. The requirement as to method is general and broad in that all relevant factors must be considered. However, we think that in rejecting comparison with the other two companies, Dr. Atkins failed to check the reasonableness of the factor upon which he relied the most. The respondent's *210 expert gave chief weight, if not entire weight, to capitalization of dividends paid by SmithCompany for one year in making his valuation as of each critical date. The rate of capitalization adopted by him was 8 per cent for 1941, and 5.5 per cent for 1942. He arrived at these percentages by taking the yield, as of each critical date of 125 industrial stocks listed in the Supplement of the Survey of Current Business, which probably represents a general index of market prices. At any rate, the index was not explained, and it appears that the 125 companies were not a group selected on the basis of comparability with Smith Company. Dr. Atkins found that the dividend yield of the 125 industrial stocks was 7.3 per cent in December 1941, and 5.5 per cent in November 1942. In his own judgment he raised this to 8 per cent for 1941, and adhered to 5.5 per cent for 1942. He capitalized SmithCompany's 1941 dividends at the rate of 8 per cent, and the 1942 dividends at the rate of 5.5 per cent, which resulted in a valuation of $5,000 per share, and $4,545 for 1942. He rounded out the second result to $4,550, and concluded that the fair market value of the stock was $5,000 and $4,550 on the respective *211 dates. Each value represents a multiple of one year's dividends. If Atkins had taken the average dividends of SmithCompany over a seven-year period and capitalized the average dividend at 8 per cent, the result would have been a lower value for the 1941 date, and, also, would have compared realistically with the yield on the December 19, 1941, market prices of Bigelow-Sanford and Mohawk based upon their average dividends. We find from all of the evidence that the preceding seven years was a representative period. It appears that the rate of 5.5 per cent used in computing the 1942 value was too low for SmithCompany stock when compared to the market prices of the stocks of the other two companies, which had a dividend yield in 1942 of an average of about 8.5 per cent based on average dividends paid over a seven-year period. Comparison of the method used by Atkins with Wilkes' analysis of dividend yields of the other two companies, which is part of the record, leads us to conclude that Atkins' method was not a fair one to apply to SmithCompany stock. [1]
*212 It has been held to be error, as a matter of law, to base the estimate of value for purposes of fair market value upon one factor to the exclusion of other relevant factors. See Commissioner v. McCann, 146 Fed. (2d) 385; Richardson v. Commissioner, 151 Fed. (2d) 102, 105; Schlegel v. United States, 71 Fed. Supp. 495. In Worcester County Trust Co. et al. v. Commissioner, 134 Fed. (2d) 578, the court disapproved the method there applied of basing value on the one factor of a multiple of earnings, and we think that respondent's proposed value runs athwart the adverse ruling in the Worcester County Trust Company case. It is based upon a multiple of one year's dividends, and little if any weight is given to any other factors. Alexander Smith & Sons paid dividends totaling $400 per share in 1941. The average dividends paid over a seven-year period was $250 per share. In 1942, dividends totaled $250 per share. In 1941, earnings were unusually high, the highest since 1928, with the exception of the year 1929. A representative period of earnings *213 and dividends should be considered so that the estimate of value may not be distorted by the abnormalities of one year. See White & Wells Co. v. Commissioner, 50 Fed. (2d) 120, 121; and Laird v. Commissioner, supra.Respondent has given too little weight to the Company's record of past earnings, past dividends, the cyclicle nature of the industry, prospective earnings, and other factors. Just as earnings are only one of the elements to be considered in determined the value of stock, so dividends are only one of the factors. Cf. Augustus E. Staley, 41 B.T.A. 752, 756. It is generally recognized by the courts that unlisted stocks in close corporations lack marketability. Wood v. United States, supra. Respondent's expert testified that he recognized that this factor should be considered in valuing the SmithCompany stock, but we are unable to recognize any real consideration of that factor by the respondent. Net asset value and book value are factors to be considered, but where the problem is to value the stock of a going concern these factors are to be considered beside other factors. See Ray Consolidated Copper Co. v. United States, 268 U.S. 373; *214 and Paul, Federal Estate and Gift Taxation, Vol. II, p. 1297, par. 18.33, where it is said: "The capital stock of a corporation, its net assets, and its shares of stock are entirely different things. The value of one bears no fixed or necessary relation to the value of the other. This is particularly true as to minority interests in a closed corporation; such interests are usually worth much less than the proportionate share of the assets to which they attach." It is noted that respondent's estimates of value of $5,000 and $4,550 exceeds and comes close to, respectively, the net current asset value per share of the stock which was $4,650 in 1941, and $4,886 in 1942. See Spreckels-Rosekrans Inv. Co. v. Lewis, 146 Fed. (2d) 982; Mathilde B. Hooper, Administratrix, 41 B.T.A. 114. Consideration has been given to Dupont v. Deputy, 26 Fed. Supp. 773. However, each case, particularly one involving the problem of valuation, must stand upon its own facts. The record in these proceedings, the facts presented to us here, must be the best guide in determining the value of the stock here involved. We have given consideration to all of the factors *215 set forth in the regulations, to all of the exhibits and testimony, and to the opinions of all of the experts. Upon all of the evidence, it has been found as a fact that the fair market value of the SmithCompany stock was $2,930 on December 19, 1941; and $3,320 on November 3, 1942. It is held that the values of the gifts which were made on December 19, 1941, were $49,810, each, for 17 shares and scrip; and $46,880, each, for 16 shares and scrip; and that the value of the 73 shares, including the scrip, held in the estate of Elizabeth Cochran Bowen, deceased, was $242,360. Certain matters are to be given effect in the Rule 50 recomputation. Decisions will be entered under Rule 50. Footnotes
1. Includes provisions for excess profits taxes in 1940, 1941 and 1942 of $735,622, $2,743,600 and $820,000, respectively. Operations for the years 1943 and 1944 resulted in estimated refunds of such taxes for the years 1941 and 1942 of $509,000 and $315,000, respectively, under the carry-back provisions of the Internal Revenue Code. ↩
2. Adjustments made to reduce surplus balance in 1939 for contingent wkmn's. comp. claims and awards; and to increase balance in 1940 for unused reserves of prior years.↩
1. The following excerpts from the analysis of Wilkes, for the petitioner, is pertinent: (Exhibit 66, pp. 15 and 27.) * * *
The dividend record of these three companies which is given on page 10 shows that Bigelow-Sanford had paid an average of $2.07 per share for the seven years ending with 1941, and a corresponding average for Mohawk Carpet of $1.18. These dividend payments were equivalent to a yield of 8.5% on the December 19, 1941 market price of $24 1/2 for Bigelow-Sanford and to 9.1% on Mohawk Carpet's market price of $13. Alexander Smith's average dividend had been $250, and if this were capitalized on the same basis as Mohawk Carpet, it would indicate a value for Alexander Smith stock of $2,750, and if capitalized at the Bigelow-Sanford rate, a value of $2,940. The average of these two figures is $2,845 which is, therefore, the value of a share of Alexander Smith stock, had the dividends which it received during the several preceding years been appraised on the same yield basis as that represented by the December 19, 1941 market price of Bigelow-Sanford and Mohawk Carpet common stocks relative to the dividends which they had received in the same period. * * *
The dividend record of these three companies which is given on page 22 shows that Bigelow-Sanford had paid an average of $2.36 per share for the seven years ending with 1942, and a corresponding average for Mohawk Carpet of $1.39. These dividend payments were equivalent to a yield of 9.08% on the November 3, 1942 market price of $26 for Bigelow-Sanford and to 7.95% on Mohawk Carpet's market price of $17.50. Alexander Smith's average dividend had been $271, and if this were capitalized on the same basis as Bigelow-Sanford, it would indicate a value for Alexander Smith stock of $2,985, and if capitalized at the Mohawk Carpet rate, a value of $3,415. The average of these two figures is $3,200 which is, therefore, the value of a share of Alexander Smith stock, had the dividends which it received during the several preceding years been appraised on the same yield basis as that represented by the November 3, 1942 market price of Bigelow-Sanford and Mohawk Carpet common stocks relative to the dividends which they had received in the same period.↩